Case number 20-1302, Mylan Laboratories Limited v. Sanofi Mature IP. Mr. Reed, please proceed. Thank you, Your Honor, and may it please the Court. The fundamental question this case presents is whether the Patent Trial and Appeal Board erroneously found that adding an intentional purpose limitation to an otherwise invalid claim extended Sanofi's patent monopoly by 10 years. The three independent legal errors committed by the Board when it extended Sanofi's patent monopoly are, first, the Board applied the wrong legal standard for obviousness. Second, the Board allowed the addition of a purely mental step to a known method to render the claims patentable. This is contrary to principles of both inherent obviousness and patent eligibility. Third, for public use, the Board improperly failed to consider evidence that was published after the priority date, even though that evidence proved what was written down with specificity before the priority date. First and foremost, the legal standard for obviousness. In early 2019, this Court issued a decision in this case holding that the preamble of the amended claims is performed with the intentional purpose of increasing survival. Unfortunately, on remand, the Board took the intent limitation too far, applying an incorrect legal standard in evaluating obviousness. And what do you believe the correct legal standard is? The correct legal standard is that in a situation where there's an intentional purpose limitation, the question should be whether a person of ordinary skill in the art reasonably could have expected to succeed in having the claimed intent, the claimed mental state, in combination with the other overt physical method steps. So, you have a reasonable expectation of having this intention regardless of whether the intention itself is reasonable? No, I think that the intention clearly has to be reasonable, but the... Well, isn't that what the Board said? The Board said you undertake these steps with the intent and that you have a reasonable expectation of accomplishing that intent. Yes, that reasonable expectation would be that the intentional purpose would be achieved, that that result would be achieved. Here, the amended claims do not require the result. They do not require increasing survival. And this highlights the difference between, for instance, for obviousness, what would be required as opposed to invalidity. Sanofi insists that Mylan must prove a reasonable expectation of increasing survival, achieving that result to show invalidity. But at the same time, Sanofi also argues that the survival result is not a claim limitation, meaning survival results would not be necessary to prove infringement. Blackwater law requires that the claim elements be the same for purposes of infringement and invalidity. The Board did not say that you would necessarily achieve the result of a greater lifespan, but that you would reasonably expect that you might do so. I don't understand what it is you're finding to be problematic there. I mean, that's essentially what we have said in other cases, including the prior Sanofi case, did we not? In the Sanofi v. Watson case, and I think that's the one you were referring to, the standard was that there be a reasonable expectation that the intentional purpose would be achieved. There's a huge difference between the facts of that case and the facts of this case, however, because in that case, there was an efficacy requirement. The effect, the result, was actually a claim limitation. In the claim language itself recited that a patient must receive an effective amount of the drug, and the district court, Judge Andrews there, construed effective amount as, quote, the amount that achieves that goal, end quote, where the goal was decreasing the risk of hospitalization. So there was this requirement in the claims of actually achieving a decreased risk of hospitalization. That efficacy result was a claim limitation. Here, there is no claim limitation of achieving the result. And so this court's decision in Intelligent Biosystems, that results not required by the relevant to reasonable expectation of success, controls. Success here has to be measured in terms of achieving what is claimed in the patented issue. Are you saying that we have different claims? The claims are the same, are they not? I'm not sure if I appreciate the claims that you're referring to, Judge Newman. The claims here are different than they were in the first appeal of this case. The original 592 claims were held unpatentable by the board, and that determination was not appealed by Sanofi. Okay, well the claims were amended, but it's the same patent, isn't that right? It's the same patent, and these claims, as amended, were presented in the first appeal, and this court determined the focus of the first appellate decision was whether the preamble was a limitation. And this court held that there is a limitation in this preamble, it's the intentional purpose limitation. So that's one of two differences between the original claims and these amended claims. The two differences being the intentional purpose limitation, and then a pretreatment regimen. And I think the pretreatment regimen is kind of the real question here is focused on the intentional purpose limitation. So with this court's guidance that that is a limitation, the question then becomes what is required to establish obviousness? And it should be the same thing that would be required to prove infringement. And Sanofi argued that... Let me go back to the Sanofi-Watson case. In there, we said that you had to have a reasonable expectation of achieving the result. But we didn't say that required actually achieving that result, right? So for instance there, if you had a reasonable expectation of a decrease in hospitalization rates from an right? Maybe, that may be the case. And I think that case and even the claims in this case highlight the uncertainty surrounding what happens in an individual patient. In an individual patient, when you administer the drug, it's virtually impossible to tell whether that drug achieved the goal of decreasing the risk of hospitalization, because you can't compare the two scenarios where you do and where you don't administer the drug. And that highlights what Sanofi here is trying to do with the population study results. Here, Sanofi is attempting to say that without the population study results, it would be impossible to know, sorry, to reasonably expect an increase in survival and that what's required is three clinical trial results. Sanofi is effectively seeking a determination that phase three trial results were the only thing that could justify a reasonable expectation. And that position is contradicted by this court's prior case law. But isn't that what your own experts said? That before that topic study, those phase three results, no one would have expected this? I don't think so. I think that the expert that we present testimony from testified that before the results, persons of ordinary school and the art were expecting the trial to be successful. No, that's not what he said. That's not what he said. Dr. Sepp was very pretty adamant that he made a strong distinction between hoping that something would happen and expecting something to happen. The questioner during his deposition to make sure that that clarification was made. That's true. And in fact, plaintiff's expert, patent owner's expert here, Sanofi's expert, similarly testified that when you're looking at treating a patient with chemotherapy like and today, a physician would only have a hope of prolonging survival. And based on this testimony, if a hope is not sufficient to reasonably expect that the intentional purpose claim limitation will be met, it wouldn't be enough to practice the claim. And no doctor could practice the amended claims even today. Now that is an illogical outcome. Addressed that testimony and totally disagreed with your interpretation of it and said that Dr. Sepp's testimony was very equivocal and did not agree with your characterization of Sanofi's expert testimony. So these are fact findings. These are fact findings, but they were arrived out in context of what we submit is the wrong legal standard for determining obviousness. The legal standard for obviousness has to be commensurate with what Sanofi will be held to improving infringement. It's two sides of the same coin. And if a doctor in administering a drug can only hope that administering that drug will actually the patient effectively, will achieve the intentional purpose, then that physician couldn't that is exactly what would be required to prove invalidity. And this highlights, I think, the board's misunderstanding that in this art in treating cancer patients with chemotherapy, hope for an individual patient was as reasonable an expectation of success as the patent itself provides. There's no guarantee. There's no certainty. Well, the board was very specific that there's no guarantee for any particular patient, but after the tropic study, there was a reasonable expectation of achieving that prolonged survival for the patient population with this particular illness, right? Yes. Yes, that's right. So, the holding there then is that, if I could just finish my thought, the holding is that the physician has to have this mental state informed by the phase three clinical trial results. And only once they have those results can they form the mental state, which highlights the idea that there's a patent ineligible subject matter here, because the only addition to the claims is this mental state from what was previously held invalid. Unless the court has further questions at this point, I'd like to reserve the remainder of my time for rebuttal. All right. Anything else for Mr. Reed at the moment? No, not for me. We'll save your rebuttal time. Okay. Mr. Minion. Thank you, Your Honor. May it please the court. One thing I think is important to make clear, Your Honors, Mr. Reed, my colleague, asserted that Sanofi was using a different standard for invalidity infringement. And in Mylan's reply brief, there are places where Mylan asserts that Sanofi agrees that increasing survival is not a claim limitation or that the claims do not require increasing survival, which they in turn assert distinguishes the claims here from those in, for example, the Sanofi v. Watson case. That's not true. Sanofi's position is that increasing survival is a part of the claims. It's a limitation. And so as part of any infringement analysis, it will be Sanofi's burden to prove, among other things, that the use of cabazitaxel according to the claimed methods is life-prolonging. And that burden will be met by primarily looking at the results of the Tropic study that show, in fact, the claimed methods do increase survival over the prior therapy. What the claims do not require, Your Honor, nor did they require in the prior cases, is that at each cycle of administration, so cabazitaxel is infused in these patients every three weeks. So what the claims do not require is that at each cycle, a physician make a specific determination in an individual patient that that patient would not be alive were it not for the cabazitaxel treatment. Now, a physician can make that determination. We have, for example, Dr. Saif. These are patients who have failed all treatment options. They're terminally ill with this prostate cancer that's metastatic. And as Dr. Saif says, if he has a patient who's living after five cycles of cabazitaxel, he says it's safe to say that they're living longer as a result of the therapy. Mylan says in their reply brief that, in fact, it's so obvious to tell when a patient is having their life belonged that it's impossible to keep it a secret. But that does not mean that at cycles, for example, one, two, or three, the first time cabazitaxel was given or when it's given three weeks later, that the physician is not practicing the claim methods. They are. By virtue of the tropic results, a physician knows that cabazitaxel, according to the claim methods, increases survival in the patient. And so by doing so with the requisite intent, they are practicing the claims just as they would from the first cycle to the fifth cycle for however long they do. That does not mean that they have to guarantee that the patient is going to have their survival increase, that they're going to live longer, or be able to predict. And that's why these claims are framed in the way they are. Do you agree that with your friend on the other side, with respect to his characterization of Dr. Sartor's testimony, saying that all he could say was that he hoped that the patient's lives would be extended? I do not agree with that, Your Honor. And I think as Your Honor pointed out, that the board looked at that testimony very closely and concluded that that was not Dr. Sartor's position. What Dr. Sartor said was prior to the results of tropic, yes, as an investigator in the study, he hoped that it would provide increased survival or the results would show increased overall survival, but that after the results of the study, he then had an expectation, he now has an expectation of increasing survival in these patients and therefore can not only now have the requisite intent of increasing survival. You know, Mylan's reference to intelligent biosystems, and that's the case that the board cited to set forth the legal standard for obviousness here, I think is instructive. And it has a nice... The point really that the board made is that you always only hope with respect to each individual patient that the results that most of the population in the tropic study achieved would be achieved for that particular patient, but that doesn't mean that you don't reasonably expect, given the tropic study's with respect to the broad base of the population, that any given one would have that chance, any given patient would really have that chance. I think there... I think, Your Honor, there is area between hope and guarantee, and where the mind frame of a person of ordinary skill in the where that line falls between hoping and guaranteeing or predicting move dramatically from the results of tropic. So having an expectation, which Dr. Sartor said he had, and the board agreed, that is prerequisite to having the intent of increasing survival of So whether the obviousness analysis as to reasonable expectation of success is rooted in reasonable expectation of success itself or in the motivation to combine, at the bottom line, as the board found, one cannot have an intent to increase survival in these patients without that requisite reasonable expectation that it will. And that's particularly true here same as in the OSI, the Apotex case, that you have an entirely unpredictable ART. You have many failures. These are patients who have failed all therapies, including Dositaxel, which is a taxane similar to Gabazitaxel. The board noted the skepticism in the ART as to the tropic study. The board noted the unexpected results. The board, again, credited Dr. Sartor's testimony that prior treatment methods that had shown to have anti-cancer activity in these patients ultimately failed to provide any life extension to these patients when studied in Phase 3. One of the things I'd like to address from Mr. Reed is characterizing Sanofi's position that it's only after the results of a Phase 3 study that you can render obvious a method of treatment claim. That's not our position. That's what our position here that there was so minimal information regarding Tabazitaxel's use and potential benefit in light of what I discussed earlier as the unpredictability of the ART. In this particular case, that evidence was not sufficient to provide a reasonable expectation of success, which is consistent with the board's findings. So, in that case, yes, you could have-it could have been a different scenario where you had a Phase 2 study or you had a teaching in the prior ART that showed that if you decreased PSA levels in these particular patients or if you decreased tumor size in these patients, that that would translate into increased survival. But, of course, that's not the case and that's not what the board found here. The board found that- Well, the board specifically found that that's not the case, right? And Dr. Seth or Seth, I don't know how to pronounce it, but he specifically said that that's not the case, right? That's correct, Your Honor. Those were not surrogates for increasing survival. Those are very different metrics. And that is borne out and highlighted very well in the prior ART in those studies where the-in Phase 2 or Phase 1 studies, a particular therapy was found to have anti-cancer activity in terms of partial responses, tumor responses, PSA reductions. But, again, those methods were not found to increase survival. On the issue of reasonable expectation of success, Your Honor, there's an assertion by Mylan that the board found that, quote, some POSAs had the intent to increase survival as of the time of the patent. That's incorrect. What the board did is they looked at the totality of the evidence and put the evidence into three different buckets. First was the evidence that the board cast as neutral with respect to a finding of reasonable expectation of increased survival, evidence supporting such a finding, and then the third bucket, evidence opposing such a finding. On the neutral evidence, the board found that the mere existence of the Phase 3 trial was neutral, that it didn't give an indication that the drug was going to be successful or not. As this Court has held before, a hypothesis does not mean that the outcome is expected. For the evidence that the board cited for supporting a finding of reasonable expectation of increased survival, the board did cite Mylan's expert, Dr. Saif's, opinion that he believed the Tropic study would succeed at the time and said, to the extent he resembles a POSA, which he, of course, is not the hypothetical person of ordinary skill in the art, the board said that would support a finding of obviousness. But as Judge O'Malley pointed out, the board found that evidence equivocal and weighed that against what the board noted was significant evidence that supported a finding that a POSA would not have expected the claimed treatment method to have resulted in increased survival. On the issues of inherency and public use and the abstract idea, as my colleague, Mr. Reed, used the phrase that applied to both, that when you're dealing with a prior art method or a method in the public domain, and I just wanted to reiterate that the claims at issue here, the steps of the claims, were not a prior art method. They were not in the public domain. And what makes that very clear is there's a chart in pages 36 to 39 of Mylan's opening brief that shows where all of the elements are found in the prior art. And Mylan needs no fewer than five different references to find each of the claim limitations. And that doesn't even get to, of course, the intent limitation. So this is not an inherency case. And this is not a case where the prior art had a, or there was a method in the public domain. And there was just an addition of a mental step as Mylan asserts. And I think if there are no questions for me, further, Sanofi respectfully requests that the court affirm the board's decision to grant Sanofi's motion to amend. Anything else for Mr. Minion? Not for me. No. Okay. Thank you. Then Mr. Reed, you have the last word. Thank you very much, Judge Newman. I'd like to focus on what Mr. Minion ended on, and that is the question of inherency and whether it's okay for Sanofi to get a patent on the natural result of a public domain method. Mr. Minion suggested that the method was not in the public, that it was not part of the prior art, when in fact the result of the original PTAB proceeding in the 2017 final written decision was the board's finding that the original claims of the 592 patent were unpatentable. In other words, they were obvious. And so we have to look at what is different between what was found unpatentable previously and what was added. What was added was the intentional purpose limitation and pretreatment regimen. Those two aspects of the claims are what are different. And with respect to the preamble's limitation, the intentional purpose requirement, that intent to increase survival, increased survival is inherent in performance of the administration of cabazitaxel, regardless of what mental state the person administering the cabazitaxel has. And that means that these claims are obvious. But didn't Dr. Seth specifically say that one would still not have used the specific combination of treatment elements here? Well, in deposition, yes. He was asked about whether he would use all three, and he said, I think I'd use this one. But regarding that pretreatment medication regimen, the three components, two points. First, there's no evidence that those components increase survival in any respect. Those are side effect alleviators. They're to prevent or control nausea and vomiting and allergic reactions. And second, the board's 2017 final written decision that was up on appeal before addressed very clearly that pretreatment regimen and held that Myelin established that that pretreatment regimen was common, it was obvious. So it can't render the claims patentable. And certainly these claims here are different than the Vanda case, where in the Vanda case, the mental state of the physician changed what the physician did, depending on the results of a determinative step. The manipulative steps were to either give a high or a low dose of a schizophrenia drug. Here, the mental state doesn't impact what you do next at all. It is a purely mental process step. And the addition of a purely mental process to a prior method is not something that is patent eligible. I think my time has expired, so unless the court has further questions, we respectfully request reversal or alternatively vacate and remand for a new decision. Okay. Any further questions for Mr. Reed? I'm hearing none. The case is taken under submission with thanks to both counsel. Thank you, your honors. Thank you, your honor. The honorable court is adjourned until tomorrow morning at 10 a.m.